IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**EOD**

12/02/2020

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SAMUEL YAW OPOKU** | § | Case No. 19-40260 |
| xxx-xx-5053 | § | |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| SWIFT FINANCIAL, LLC, | § | |
| as servicing agent for WebBank | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 19-4064 |
| | § | |
| SAMUEL YAW OPOKU | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the complaint filed by the Plaintiff, Swift Financial, LLC, in its

capacity as the servicing agent for WebBank (the "Plaintiff") seeking a determination of

whether an alleged debt owed to it by the Defendant-Debtor, Samuel Y. Opoku ("Opoku"

or the "Debtor"), is dischargeable, the Court issues the following findings of fact and

conclusions of law.  The Plaintiff contends that the debt is nondischargeable under the

alternative grounds set forth in 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), § 523(a)(4), and

§ 523(a)(6).  After the trial, the Court took the matter under advisement.  This decision

disposes of all issues pending before the Court.

---

[1]  These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

## FINDINGS OF FACT

1.  Spring Stars, LLC ("Spring Stars") was a company organized as an Ohio limited liability company, 100% of which was owned by the Debtor-Defendant, Samuel Y. Opoku (the "Defendant").[2]

2.  Spring Stars was formed on November 14, 2013[3] and, at the time of the loan agreement in question in this dispute, was engaged as a licensed and bonded freight hauling company.

3.  The Defendant was the 100% owner of Spring Stars and was, at all times relevant to this dispute, an officer, insider and the sole control person of Spring Stars, and accordingly owed fiduciary duties to his company.[4]

4.  Notwithstanding his status as the sole owner of Spring Stars, the Defendant is not a sophisticated businessman and, as is true with many closely-held entities, legal niceties were often ignored and the line of demarcation between the corporate entity and its individual owner often became blurred.

5.  In years prior to 2018, the Defendant's efforts to establish and develop the trucking business of Spring Stars had been a slow and inconsistent financial struggle.

6.  Spring Stars had developed its freight hauling business by utilizing rented trucks for most of its existence.

7.  Utilizing rented trucks for its business operations, for which Spring Stars had to pay mileage charges in addition to lease payments, was an expensive proposition.

8.  It had often contributed to revenue stream disruptions for Spring Stars in the past.

9.  As a result, the Defendant testified without contradiction that he had always utilized personal accounts to assist his company throughout its existence whenever corporate funds were either unavailable or expedited access to such corporate

---

[2]  ¶ 2(a) of the Statement of Stipulated Facts ("Stipulated Facts") as agreed upon by the parties and set forth in the approved Joint Pre-Trial Order ("PTO") entered in this adversary proceeding on September 11, 2020 [dkt #22].

[3]  *Id*.

[4]  ¶ 2(e) of the Stipulated Facts.

funds in necessary amounts was precluded by transfer limitations of his bank.

10.    A major and persistent issue in the Defendant's management of Spring Stars during its history, which was critical to its ongoing financial integrity, was the procurement and maintenance of required insurance coverage on all trucks utilized.[5]

11.    Without acceptable insurance coverage on its trucks and trailers, any trucking company is precluded by regulatory agencies from providing transportation services.

12.    Such proof of insurance was also apparently critical to the ongoing business relationships which Spring Stars had with its major customers as certificates verifying the insurance coverage from July 2017 to July 2018 had been tendered to at least five vendors, plus Penske as the lessor of certain units.[6]

13.    The Defendant acknowledged at trial that his trucking company could not operate absent compliance with the insurance requirements.

14.    Despite its critical nature, the acquisition and maintenance of appropriate insurance coverage for its operations was always problematic for Spring Stars and was often an annual concern for the Defendant.

15.    Such compliance often required the involvement of specialized commercial insurance carriers and agents, such as Spring Stars' insurance broker, the Sebrite Agency of Minnetonka, Minnesota.[7]

---

[5]  For example, 49 U.S.C. § 31139, and the regulations promulgated under that provision, prescribe "the minimum levels of financial responsibility required to be maintained by motor carriers of property operating motor vehicles in interstate, foreign, or intrastate commerce." 49 C.F.R. § 387.1 (2018).  According to those regulations "[n]o motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility as set forth in § 387.9 of this subpart." 49 C.F.R. § 387.7(a) (2018).  "The purpose of [the regulations promulgated under § 31139] is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." *Castro v. Budget Rent-A-Car Sys., Inc*., 154 Cal. App. 4th 1162, 1172–73, 65 Cal. Rptr. 3d 430, 436 (2007).

[6]  Defendant's Ex. 12.

[7]  *Id.*

16.     Spring Stars had compliant insurance coverage for its trucking fleet for the annual
        period from July 3, 2017 to July 3, 2018.[8]

17.     In that particular time period, Spring Stars had enjoyed a stablized revenue stream,
        primarily by providing transportation services to a company called Lasership and
        servicing its contractual obligations in the Cincinnati, Ohio area.

18.     The Defendant had also successfully procured for Spring Stars sufficient financing
        from three different lenders in order to acquire ownership of its own vehicles,
        consisting of at least thirteen tractors and box trucks.[9]

19.     Consistent with its history, just as Spring Stars began to enjoy the benefits of some
        stability, storm clouds appeared on the horizon yet again.

20.     On or about May 1, 2018, Spring Stars was notified that its largest customer,
        Lasership, had lost its bid on the "CVG Cincinnati, OH area contract."[10]

21.     Though the termination was apparently not immediate, the Defendant
        acknowledged at trial that 70% of Spring Stars' business revenue at that time was
        derived from its relationship with Lasership.[11]

22.     With the knowledge that its revenue stream would at some point be negatively
        affected by the loss of the Lasership contract, the Defendant began to search for
        alternative sources of work for his trucking business.

23.     However, the gross business income of Spring Stars remained strong through June
        2018.

24.     The uncontradicted evidence establishes that the gross business income for Spring
        Stars in the first half of 2018 was as follows:  January: $528,000;  February:
        $238,000; March: $286,000; April: $327,000; May: $294,000; June: $436,000; and
        July:  $381,000.

---

[8] Defendant's Ex. 10.

[9] *Schedule A/B* [dkt #6] filed on February 14, 2019 in the Debtor-Defendant's main bankruptcy
case under case no. 19-40260.

[10]  ¶ 2(n) of the Stipulated Facts.

[11]  The record is unclear as to the history or duration of Spring Stars' relationship with Lasership.

25.   Though Spring Stars successfully operated with its own trucking fleet in the first half of 2018, the Defendant was still searching for operating capital for Spring Stars.

26.   The Defendant had personal contacts with a Los Angeles investment group known as Worldwide Capital and the Defendant believed that he might gain access to a $1 million loan for Spring Stars.

27.   In the spring of 2018, the Defendant also began to receive unsolicited advertisements for the availability of a business capital loan from the Plaintiff, Swift Financial, LLC (the "Plaintiff").

28.   The Plaintiff offered the availability of short-term business loans to the public through an internet portal known as LoanBuilder.

29.   Any business loan that ultimately gained approval through the LoanBuilder process was actually funded by WebBank and was then serviced by the Plaintiff.

30.   As he prepared Spring Stars to diversify from its heavy reliance upon the Lasership revenue stream, the Defendant was notified by the Sebrite Insurance Agency that the 2017 insurance policy from AmTrust Insurance Company would not be renewed by the company upon its renewal date in July 2018.

31.   The Defendant was familiar with the ongoing challenge of procuring affordable insurance coverage for his trucking operations due to its prior incidents and he was hopeful that Sebrite could locate a feasible and affordable alternative for the upcoming year.

32.   The Defendant was aware at that time of what could be characterized as "sub-prime" insurance alternatives, but many of those alternatives required a sizable down payment of 25% or more toward the substantial premium costs.

33.   Again, however, without proof of satisfactory insurance, the trucking operations of the Defendant's company would be suspended.

34.   Thus, the insurance problem was significant and mandated that the Defendant identify a solution.

35.   Meanwhile, the Defendant was still engaged in the search for additional capital for Spring Stars in order to take full advantage of its newly-acquired vehicles.

36.  The Defendant was soon reminded of the unsolicited direct mail invitations for available business financing which he had received by various means from the Plaintiff.

37.  The Defendant, acting on behalf of Spring Stars, applied for the business loan from the Plaintiff through an online application process.

38.  The Defendant had never applied for this type of business loan through a virtual environment.

39.  The Defendant complied with each information request contained in the online application issued by the Plaintiff by which it sought to evaluate the Defendant's company as a potential borrower.

40.  In the loan application, the Defendant stated that Spring Stars generated an average of $200,000 in gross monthly sales.[12]  That was a more conservative figure than the actual amounts received in the prior six-month period.

41.  The Plaintiff insisted upon a mandatory payment authorization whereby it could initiate its own weekly payment from a designated Spring Stars bank account.

42.  The Defendant was also required to execute an individual guaranty agreement to the Plaintiff.

43.  In evaluating the Spring Stars' application, the Plaintiff's representative, Bonnie Carey, testified that the application (as applicable to this transaction) sought to confirm: (1) the percentage of ownership held by the applying business owner; (2) the annual revenue of the business; and (3) the existence of any liens or judgments which could interfere with the repayment obligations.

44.  Ms. Carey confirmed that the Plaintiff's credit decision would be particularly influenced by the available monthly revenue stream and the lack of any liens or judgments.

45.  To verify the business income of Spring Stars, the Plaintiff requested, and the Defendant supplied, bank statements for the period of February through May 2018.

---

[12]  ¶ 2(e) of the Stipulated Facts.

46.   The Plaintiff also independently investigated whether Spring Stars was a company in good standing with appropriate governmental agencies and, because it was a trucking company, such inquiry encompassed Spring Stars' standing with the United States Department of Transportation.

47.   The Defendant truthfully answered every question tendered by the Plaintiff in its application form and supplied all of the supplemental information requested by the Plaintiff.

48.   There was no "catch-all" question included in the Plaintiff's online application which inquired about the existence of other circumstances which could affect the applicant's ability to repay the loan.

49.   Nor did the Plaintiff prompt the Defendant in its followup inquiries to identify the existence of any issue known to him which could threaten the future revenue stream of the borrower.

50.   Rather than speculating about information which the Plaintiff did not request, the Defendant focused on supplying the information which had been requested.

51.   Thus, the Defendant did not disclose in the loan application process that Spring Stars' largest customer, Lasership, had lost its bid on the "CVG Cincinnati, OH area contract" because the Plaintiff did not specifically ask about it.[13]

52.   The Defendant did not disclose in the loan application process the ongoing challenge to procure affordable insurance coverage for the coming year.

53.   The Defendant did not disclose his interest in other business entities because the Plaintiff did not inquire about such information.

54.   The Defendant's testimony that he only knew to answer the questions he was asked, and that he would have answered any other question tendered to him about the business operations of Spring Stars if asked, is credible and compelling.

55.   Upon review of all requested information, the Plaintiff gave preliminary approval to a loan to Spring Stars in the amount of $100,000.00, payable weekly over a period of 52 weeks at a weekly payment amount of $2,294.38.[14]

---

[13]  ¶ 2(n) of the Stipulated Facts.

[14]  Plaintiff's Ex. A at 2.

56.     Though the preliminary loan approval characterizes the credit cost of the $100,000 loan as a "Total Interest Charge" of $19,307.60, it effectively operated as a fixed fee amount for the granting of the loan — a fee that would have to be fully paid by the borrower, even the loan was pre-paid prior to maturity.[15]

57.     The Plaintiff sent a written agreement to the Defendant for execution.

58.     On June 29, 2018, the Defendant signed the loan agreement on behalf of Spring Stars as the borrower.[16]

59.     Under the Loan Agreement, the Plaintiff was granted a security interest in all business assets of Spring Stars, including its accounts receivable, to secure repayment of the Loan Agreement until the debt was repaid.[17]

60.     It appears likely that any such lien granted to Plaintiff would have been significantly subordinated to prior liens, although the evidence is insufficient to determine the precise priority of any such lien as to any particular asset.

61.     The Defendant also executed an individual guaranty of the loan indebtedness.[18]

62.     By signing the agreement, the Defendant represented that: (1) he was authorized to bind Spring Stars to the terms of the agreement; (2) the loan proceeds would be used for business purposes only and not for personal, family or household purposes;[19] (3) that he agreed to the personal guaranty;[20] and (4) that he understood and agreed to the direct payment obligation,[21] the arbitration clause, and other

---

[15]  *Id*. at 3.

[16]  ¶ 2(b) of the Stipulated Facts.

[17]  ¶ 2(d) of the Stipulated Facts.

[18]  Plaintiff's Ex. A at 4; ¶ 2(a) of the Stipulated Facts.

[19]  As the initial commitment explained, this provision had to be expressly acknowledged by the borrower and was required so "that certain important duties imposed upon entities making Loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to the Loan or this Agreement."  *Id*. at 3.

[20]  ¶ 2(e) of the Stipulated Facts.

[21]  *Id*. at 14-15.

referenced provisions on behalf of himself and Spring Stars.[22]

63.   On June 29, 2018, the Plaintiff wired $100,000 to Spring Stars' bank account; and the Debtor caused Spring Stars to transfer $100,000 to the Debtor's personal account "to make some payments on different cards possible."[23]

64.   The Plaintiff contends that such a transfer violated the covenant that the loan would be used for business purposes only and not for personal, family or household purposes.

65.   However, the Defendant testified that the transfer was for a business purpose and that any payments from the proceeds on credit card obligations would have been on corporate credit cards.

66.   The evidence does not trace nor otherwise disclose the disposition of the loan proceeds, other than the Defendant's testimony that the funds were used to pay corporate obligations and further the objectives of the business.

67.   The evidentiary record does support that the movement of money among various bank accounts was consistent with the Defendant's prior financial practices regarding the operation of his business.

68.   Spring Stars' bank statements for the first half of 2018, four months of which were tendered to the Plaintiff in consideration of the loan application, do reveal intermittent transfers throughout that period by and among the various checking and savings accounts of Spring Stars and the Defendant.[24]

69.   The evidentiary record is not sufficient to allow for a clear identification, much less a satisfactory reconciliation, of the Defendant's bank accounts or for the Court to evaluate the legitimacy of particular transfers involving those accounts.

70.   Despite the use of the multiple accounts, the Plaintiff offered insufficient evidence to substantiate that the sums were diverted to personal use or were used for anything other than a business purpose.

---

[22] *Id*. at 4.

[23] ¶ 2(c) of the Stipulated Facts. No further explanation regarding the payments was given.

[24] *See, e.g*., Defendant's Ex. 9 at 2 and 5; Defendant's Ex. 8 at 5;  Defendant's Ex. 6 at 4; and Defendant's Ex. 5 at 5.

71.   Thus, in light of the applicable burden of proof and that the expressed purpose of that particular covenant was to confirm the inapplicability of any consumer protection provisions with regard to the loan procedures and disclosures, the Plaintiff has failed to establish by a preponderance of the evidence that the Defendant's conduct constituted a breach of the business purpose requirement, much less sufficient proof of the Defendant's intention to engage in fraudulent conduct.

72.   Despite all of his efforts, the Defendant was unable to procure acceptable replacement insurance coverage for the Spring Stars' fleet by the expiration of its prior policy on July 3, 2018.

73.   In accordance with his legal and administrative duties, the Defendant temporarily suspended the trucking operations of Spring Stars on July 3 as he continued to try to procure insurance coverage for Spring Stars' fleet.[25]

74.   Meanwhile, the Defendant desperately sought alternatives to meet Spring Stars' contractual obligations, not only the initiation of payments to the Plaintiff, but particularly with regard to the lienholders secured by his company's trucking fleet.

75.   The Defendant had previously learned (presumably from his insurance broker) that, despite the difficulties of obtaining suitable insurance for Spring Stars, a newly-formed company would likely be capable of obtaining coverage.[26]

76.   Without a feasible alternative, on July 2, 2018, the Debtor formed Merger Stars, LLC, an Ohio limited liability company (hereafter, "Merger Stars").[27]

77.   Just as with Spring Stars, the Debtor was the 100% owner of Merger Stars, and at all times relevant was an officer, insider and control person of Merger Stars.[28]

---

[25] ¶ 2(m) of the Stipulated Facts states that "Shortly after the formation of Merger Stars, Spring Stars insurance was cancelled, and it ceased to operate."  Such cessation was of a temporary nature as it sought to meet regulatory requirements.

[26] The Defendant stipulated with the Plaintiff that he had decided to form this second company in April 2018, see ¶ 2(g) of the Stipulated Facts, but it was evidently the Defendant's least favored alternative since he waited until the eve of the insurance lapse in order to proceed with that formation.

[27] ¶ 2(g) of the Stipulated Facts.

[28] ¶ 2(h) of the Stipulated Facts.

78.    Merger Stars did not exist until July 2, 2018.

79.    Thus, the Defendant stipulated with the Plaintiff that prior to July 2, 2018, Merger Stars owned no assets of any kind, and had done no business of any kind.[29]

80.    In light of that chronology, the Defendant further stipulated with the Plaintiff that at the time of the execution of the Loan Agreement, the Debtor did not advise the Plaintiff of the existence of Merger Stars, and the Plaintiff was unaware of its existence.[30]

81.    At the time of the execution of the Loan Agreement, Merger Stars did not, in fact, exist.

82.    Merger Stars obtained required insurance coverage on July 15, 2018.

83.    At that time, shortly after its formation, Merger Stars began using Spring Stars vehicles to earn business revenue.[31]

84.    Merger Stars did not pay Spring Stars for the ownership or use of the Spring Stars business assets.[32]

85.    This was not an unauthorized sale of assets to Merger Stars.

86.    It was instead a temporary and apparently uncompensated licensing agreement which allowed the trucks to keep moving and generating income because Merger Stars at that point could obtain insurance and required regulatory clearance when Spring Stars could not.

87.    Operations under the Merger Stars name were conducted with the Spring Stars employees.

88.    Operations under the Merger Stars name fulfilled the contractual obligations of Spring Stars.

---

[29]  ¶ 2(i) of the Stipulated Facts.

[30]  ¶ 2(j) of the Stipulated Facts.

[31]  ¶ 2(k) of the Stipulated Facts.

[32]  ¶ 2(l) of the Stipulated Facts.

89.     The evidence tendered does not provide an accounting which traces the revenues generated under the name of Merger Stars in this temporary period.

90.     There is no evidence that Merger Stars kept any revenue from its operations to the exclusion of Spring Stars.

91.     There is no evidence that Merger Stars even had a bank account.

92.     There is no evidence that this temporary and informal arrangement materially impaired the security interest of the Plaintiff.

93.     The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant sought and procured the loan from the Plaintiff with the intent to abandon Spring Stars as an operating entity in an attempt to escape its liabilities and operational difficulties.

94.     Such a premise is refuted by the fact that the Defendant went to extraordinary efforts to maintain timely payments to the Plaintiff despite the surrounding setbacks.

95.     The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant sought and procured the loan from the Plaintiff with an intent to proceed with actions that would have prevented the payment of the loan to the Plaintiff.

96.     Indeed the actions of the Defendant appear consistent with the contractual obligation to take all reasonable action to maintain the normal business operations of Spring Stars.

97.     Any inference, if any, to be derived from this evidence would favor the likelihood that the Plaintiff actually benefited from this temporary arrangement in that the business obligations of Spring Stars were preserved while it sought to solve its insurance problems.

98.     Most compelling is the fact that, despite the cessation of operations in its own name for a period, and contrary to the allegations that the Defendant had engaged in a fraudulent diversion of proceeds to another entity, all of the twelve (12) required weekly payments of $2,294.38 to the Plaintiff were made by or on behalf of Spring Stars in the months of July, August, and September 2018.

**-12-**

99.     In other words, particularly from the Defendant's perspective, all of his actions to preserve operations successfully ensured Spring Stars' performance on its loan obligations to the Plaintiff.

100.    Performance on the loan obligation of Spring Stars to the Plaintiff continued until October 8, 2018, when the bank account of Spring Stars was frozen through the actions of another creditor.[33]

101.    Upon the loss of access to its bank account, Spring Stars and its designee ceased operations in October 2018.

102.    On January 31, 2019, the Debtor-Defendant filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court.

103.    The claim of the Plaintiff was scheduled as an unsecured claim under the name of "Swift Capital" in the amount of $119,311.[34]

104.    After all offsets and credits, the remaining principal amount due to Plaintiff under the Loan Agreement was $89,560.66 as of the filing of Debtor-Defendant's bankruptcy.[35]

105.    The indebtedness is still due and owing by the Defendant to the Plaintiff.

106.    The Plaintiff timely filed its complaint for a determination of the dischargeability of a debt on June 18, 2019, seeking to except its claim from the scope of any discharge granted to the Defendant.

107.    The Plaintiff contends that its claim is nondischargeable:  (1) as a debt obtained by a false representation, false pretenses, or actual fraud under 11 U.S.C. § 523(a)(2)(A); (2) as a false statement in writing respecting the debtor's financial

---

[33]    ¶ 2(f) of the Stipulated Facts:  "Payments on account of the Loan Agreement were made to Plaintiff from July through October 2018."

[34]    Schedule E/F ¶ 4.23 at 12, as filed by the Debtor on February 14, 2019 [dkt #6] in case no. 19-40260.

[35]    ¶ 2(f) of the Stipulated Facts.

condition under 11 U.S.C. § 523(a)(2)(B);[36] (3) as an embezzlement or an act of larceny under 11 U.S.C. § 523(a)(4); or (4) as a debt for a willful and malicious injury under 11 U.S.C. § 523(a)(6).

108.  In this case, the Plaintiff contends that, though unsolicited by its own inquiries presented in its online loan application, the Defendant fraudulently failed to disclose one or more material facts regarding the operations of his corporate entity at the time of the loan application.

109.  The Plaintiff has failed to demonstrate by a preponderance of the evidence that any debt owed to it by the Defendant was procured by an overt statement constituting a false representation or false pretenses.

110.  The Plaintiff has failed to demonstrate by a preponderance of the evidence that any debt owed to it by the Defendant was procured through an nondisclosure of information that was withheld by the Defendant with the intention and purpose of deceiving the Plaintiff.

111.  Any suggestion that the Defendant possessed an intent to defraud the Plaintiff is refuted by the significant efforts in which the Defendant engaged in order to ensure performance of Spring Stars' loan obligation to the Plaintiff.

112.  The Plaintiff and the Defendant had no prior relationship, contractual or otherwise, at the time that the online loan application process began.

113.  The Defendant was not a sophisticated businessman, and he either rejected or discounted his company's need for professional legal or accounting assistance in conducting its operations.

114.  Despite his obvious knowledge about his company's business operations, the Defendant was generally unfamiliar with virtual lending transactions and had little knowledge about what business information might be germane or necessary, particularly given the virtual environment in which the loan was sought.

115.  To faciliate the loan approval, the Defendant was simply prepared to answer any inquiry which the Plaintiff deemed necessary in order to evaluate his creditworthiness and that of his company.

---

[36]  The inadvertent omission of the Plaintiff's cause of action under § 523(a)(2)(B) from the pre-trial order submitted by the parties and approved by the Court was cured by modification at trial without objection from the Defendant.

116.   Indeed, the Defendant truthfully answered every question tendered by the Plaintiff
in its application form and supplied all of the supplemental information requested
by the Plaintiff.

117.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that the
Defendant had actual knowledge that unsolicited information regarding his
company's business operations needed to be disclosed even though the Plaintiff
had not sought such information.

118.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that the
Defendant intentionally concealed unsolicited information for the purpose of
inducing a loan from the Plaintiff by fraudulent means.

119.   On the other hand, the Plaintiff was fully capable of asking any question or
requiring any affirming documentation that it thought necessary to verify the
creditworthiness of any prospective borrower.

120.   The Plaintiff was experienced in evaluating loan applications procured in a virtual
environment on the basis of answers to specific questions which it had developed
and presented in its online questionnaire, together with any subsequent due
diligence which it deemed necessary to verify the procured information.

121.   On the basis of its experience, the Plaintiff occupied the best position to protect
itself from unreasonable risk by its control of the process by which information is
sought from the prospective borrower in its application process and, in particular,
its ability to demand disclosure of any other issue which could threaten the
prospective borrower's ability to repay the loan.

122.   Under the totality of the circumstances in this transaction, the Defendant did not
intentionally nor improperly exploit any undue advantage arising from information
that he did not know to convey and which the Plaintiff had failed to solicit.

123.   The Plaintiff has failed to demonstrate by a preponderance of the evidence to
demonstrate the existence of circumstances under which a legal duty could
properly be imposed upon the Defendant to supply the Plaintiff with information
that the Plaintiff had not sought nor solicited in its loan application process.

124.   However, even assuming the existence of such a legal duty, the Plaintiff has failed
to demonstrate by a preponderance of the evidence that the Defendant failed to
disclose such information with a fraudulent intent.

-15-

125.    Because the Defendant's silence regarding the status of his company's business regarded an existing fact, as a matter of law, any such omission cannot be properly characterized as actual fraud in this circuit.[37]

126.    Silence regarding the existence of a material fact does not constitute a statement which can properly fall under the auspices of 11 U.S.C. § 523(a)(2)(B).

127.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant acted in a fiduciary capacity as to the Plaintiff at any time.

128.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that a trust relationship existed between the Defendant and the Plaintiff prior to the creation of the indebtedness in question.

129.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant appropriated any funds from the Plaintiff with a fraudulent intent.

130.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant took lawful control of property owned by the Plaintiff.

131.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant appropriated property owned by the Plaintiff with a fraudulent intent.

132.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant engaged in a wrongful taking of the Plaintiff's property.

133.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant converted the property of the Plaintiff to his own use.

134.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant committed larceny arising from the Plaintiff's decision to lend money to Spring Stars.

135.    The Plaintiff has failed to demonstrate by a preponderance of the evidence the existence of a deliberate or intentional injury inflicted upon it by the Defendant.

136.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that, at

---

[37] See conclusion of law # 16.

the time that the debt was created, the Defendant acted with the specific subjective intent to cause injury to the Plaintiff.

137.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that, at the time that the debt was created, an affirmative action of the Defendant created an objective substantial certainty of harm to the Plaintiff.

138.   While the circumstances demonstrate a significant financial loss to the Plaintiff, thereby placing the Plaintiff in a sympathetic light, such sympathy cannot be permitted to stand in lieu of the required degree of proper proof pertaining to the Defendant's conduct and intentions under these circumstances, particularly in light of the Bankruptcy Code's directive that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor.

139.   To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

**[remainder of page intentionally blank]**

## CONCLUSIONS OF LAW

1.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1334 and 523. This
    Court has personal jurisdiction over the parties to this adversary proceeding.

2.  This Court has authority to enter a final judgment in this adversary proceeding
    since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C.
    § 157(b)(2)(I) and (O) and meets all constitutional standards for the proper
    exercise of full judicial power by this Court.

3.  This Court has the authority to enter a final judgment on an unliquidated claim
    when determining the dischargeability of that debt in a bankruptcy case. *Morrison
    v. Western Builders (In re Morrison)*, 555 F.3d 473, 478–79 (5th Cir. 2009).

4.  Such authority recognized in the Fifth Circuit is consistent with decisions of sister
    courts of appeal. *See, e.g., Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015,
    1017–18 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66
    (6th Cir.1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *N.I.S. Corp.
    v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991).

5.  The recognized authority of a bankruptcy court to enter a final judgment on an
    unliquidated claim when determining the dischargeability of that debt in a
    bankruptcy case was not impaired by the decision in *Stern v. Marshall*,  564 U.S.
    462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).  *Farooqi v. Carroll (In re Carroll)*,
    464 B.R. 293, 312 -313 (Bankr. N.D. Tex. 2011); *Dragisic v. Boricich (In re
    Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011).

6.  Even if *Stern* had arguably impacted that authority [which it did not],

    > the court would be compelled to follow existing Fifth Circuit
    > precedent as set out in *Morrison*  . . .  as this court cannot
    > ignore (much less 'overrule') existing binding circuit
    > precedent, even if that precedent is thought to be inconsistent
    > with a later decision by the Supreme Court. Only the circuit
    > itself can overrule its own precedents.

    *Christian v. Kim (In re Soo Bin Kim)*, 2011 WL 2708985, at *2 n.2 (Bankr.
    W.D. Tex., July 11, 2011), as cited in *Carroll*, 464 B.R. at 313 and *Dietz v.
    Ford (In re Deitz)*,  469 B.R. 11, 21 (B.A.P. 9th Cir. 2012).

7.    The complaint filed by the Plaintiff seeks a determination that the debt which he alleges is owed to it by the Defendant should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), § 523(a)(4) and/or § 523(a)(6).

8.    In seeking to except the debt owing to it from the scope of the discharge granted to the Defendant, the Plaintiff assumes the burden of proof under a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

9.    All exceptions to discharge under § 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[38]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

*Nondischargeability Under § 523(a)(2)(A):  Debt Arising by Fraud, False Pretenses, or False Representation.*

10.   The Plaintiff's Complaint seeks a determination that the debt owed to it should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

11.   11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under § 727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

12.   Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[39] the

---

[38]   However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

[39]   *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was

Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

13. The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].

14. In order for a debtor's representation to constitute a false representation or false pretense, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[40] *RecoverEdge L.P.* at 1292-93; *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

15. In this case, the Plaintiff contends that, though unsolicited by its online loan application, the Defendant fraudulently failed to disclose one or more material facts regarding the operations of his corporate entity at the time of the loan application.

16. Because the Defendant's silence regarding the status of his company's business regarded a past or existing fact, any such omission cannot be properly characterized as actual fraud in this circuit.[41]

---

actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A). Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[40] Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance, in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case. *In re Hernandez*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

[41] To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time

17.   Instead, the validity of the Plaintiff's claim under § 523(a)(2)(A) based upon an allegedly fraudulent omission or nondisclosure in the face of a duty to disclose is properly characterized as a false representation. *Selenberg v. Bates* (*In re Selenberg*), 856 F.3d 393, 399 (5th Cir. 2017).

18.   "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required." *Id.*

19.   "The false representations must be made knowingly and fraudulently, but a debtor's silence regarding a material fact can also constitute a false representation under the Code." *Purser v. Scarbrough* (*In re Scarbrough*), 516 B.R. 897, 921 (Bankr. W.D. Tex. 2014) (citing *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1288 (8th Cir.1987)).

20.   The elements of a fraudulent nondisclosure claim involves a consideration of applicable state law.

21.   The parties contractually agreed that the terms of their relationship would be governed by the law of the state of Utah.[42]

22.   A knowing and fraudulent falsehood may arise by nondisclosure under Utah law when a party with a duty to disclose facts fails to do so. *Mitchell v. Christensen,* 31 P.2d 572 (Utah 2001).

23.   "A party is liable for fraudulent nondisclosure if he omits a material fact when there is a duty to disclose, for the purpose of inducing action on the party of the other party, with actual, justifiable reliance resulting in damage to that party." *Barber Bros. Ford, Inc. v. Foianini*, 2008 WL 5257123 at *1 (Utah App. Dec. 18, 2008) (quoting *Taylor v. Gasor, Inc.*, 607 P.2d 293, 294 (Utah 1980)).

24.   However, as one court recently reminded us,

---

they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995), *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

[42]  Plaintiff's Ex. A at 11, ¶ 26.

> [I]t is important to remember that not all silence is fraudulent.
> Debtors do not automatically have an obligation to furnish
> financial information to creditors or potential creditors, such
> that their failure to do so is fraud.

*Washington County Dept. of Housing Servs. v. Hall* (*In re Hall*), 2019 WL
4281911, at *4 (Bankr. D. Or. Sept. 9, 2019).

25.    "The three elements of fraudulent concealment [nondisclosure] are best described
       in this order:
       (1) there is a legal duty to communicate information;
       (2) the nondisclosed information is known to the party failing to disclose, and
       (3) the nondisclosed information is material."[43]

       *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 289 (Utah 2006) [concluding that a
       contractor-seller owed an independent duty to a home purchaser to disclose known
       material information regarding the real property].

26.    The existence of a duty to disclose is a question of law for the Court, though it is
       informed by the evidence presented.

27.    "The determination of whether a legal duty exists falls to the court.  It is a purely
       legal question, and since in the absence of a duty a plaintiff will not be entitled to a
       remedy, it is the first question to be answered."  *Id*. at 286.

28.    "From where does a duty arise?  To properly answer the duty question, a court
       must understand that the structure and dynamics of the relationship between the
       parties gives rise to the duty."  *Id*.

29.    Such an inquiry necessarily "involves the examination of the legal relationships
       between the parties, an analysis of the duties created by these relationships, and
       policy judgments applied to relationships." *Davencourt at Pilgrims Landing
       Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244
       (Utah 2009), citing *Yazd*, 143 P.3d at 289 (internal quotation marks omitted).

30.    "Age, knowledge, influence, bargaining power, sophistication, and cognitive

---

[43]  For a fact to be material, "the information must be 'important.'  Importance, in turn, can be
gauged by the degree to which the information could be expected to influence the judgment of a person
buying property or assenting to a particular purchase price." *Yazd,* 143 P.3d at 289.

ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another." *Yazd,* 143 P.3d at 289.

31.   "Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage." *Id*.

32.   "A person who possesses important, even vital, information of interest to another has no legal duty to communicate the information where no relationship between the parties exists." *Id*. at 287.

33.   The established circumstances surrounding the procurement of this particular loan does not warrant the imposition of a legal duty upon the Defendant to provide additional, unspecified information which the Defendant did not know to tender, which the Plaintiff had failed to solicit, and which has now been selectively identified by the Plaintiff after-the-fact.

34.   The Defendant had no legal duty to communicate to the Plaintiff within the loan application process unsolicited and unidentified information regarding the status of particular customer relationships of Spring Stars.

35.   The Defendant had no legal duty to communicate to the Plaintiff within the loan application process unsolicited and unidentified information regarding the status of Spring Stars' annual challenge to procure affordable insurance coverage.

36.   The Defendant had no legal duty to communicate to the Plaintiff unsolicited and unidentified information regarding the existence and activities of other entities owned by the Defendant.

37.   Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it by the Defendant is nondischargeable as a debt obtained by a false representation, false pretenses, or actual fraud pursuant to § 523(a)(2)(A) of the Bankruptcy Code must be denied.

*Nondischargeability Under § 523(a)(2)(B):  Debt Arising by False Financial Statement.*

38.  Specifically, in order to render a debt nondischargeable under the provisions of 11 U.S.C. § 523(a)(2)(B), a plaintiff must demonstrate the following by a preponderance of the evidence:

> (1)  that the debtor made a written statement regarding his financial condition;
> (2)  that the written statement regarding his financial condition was materially false;
> (3)  that the creditor reasonably relied upon the materially false written statement; and
> (4)  that the materially false written statement was published by the debtor with the intent of deceiving the creditor.

39.  The existence of each of these four elements is a question of fact.  *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).

40.  In the context of § 523(a)(2)(B), this case presents the issue of whether nonverbal communication, specifically an alleged failure of a defendant to reveal additional information other than that directly solicited by a plaintiff in a loan application process, can constitute a false "statement" respecting one's financial condition.

41.  Simply stated, the most fundamental aspect of a determination of nondischargeability under § 523(a)(2)(B) is the requirement of a statement.

42.  The Bankruptcy Code does not define the term "statement."

43.  When a term goes undefined in a statute, federal courts give the term its ordinary meaning.  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S. Ct. 1997, 2002, 182 L. Ed. 2d 903 (2012).

44.  "In determining the ordinary meaning of terms, dictionaries are often a principal source."  *NPR Investments, L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014) (citing *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir.2005)).

45.  The Webster's Dictionary defines a "statement" as "the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2229 (1976) ("Webster's"), as recently cited in *Lamar, Archer &*

*Cofrin, L.P. v. Appling*, ___ U.S.___, 138 S.Ct. 1752, 1759, 201 L.Ed.2d 102 (2018).

46.     "The Webster's definition [of a statement]—the act or process of stating, reciting, or presenting orally—does not contemplate silence or even nonverbal communication." *Oregon v. Mcharo* (*In re Mcharo*), 611 B.R. 657, 662 (B.A.P. 9th Cir. 2020).

47.     The exclusion of allegedly deceptive silence as a statement under § 523(a)(2)(B) is further supported by Supreme Court dicta indicating that debt incurred through fraudulent conduct, including a failure to disclose relevant facts, can be held nondischargeable under § 523(a)(2)(A), particularly in light of its ruling in *Husky Int'l Elecs., Inc. v. Ritz*, ___U.S. ___, 136 S.Ct. 1581, 1586 (2016),  which declared that fraud can occur without a representation.  *See Mcharo*, 611 B.R. at 662 and cases cited therein.

48.     In a salient discussion of the ramifications of this characterization, one court recently observed that, in light of *Husky* and its expansion of the scope of § 523(a)(2)(A), it might be more accurate to treat deceptive silence "not as a form of misrepresentation but rather as a form of fraud by conduct."  *Hall*, 2019 WL 4281911, at *4.

49.     Conversely, treating silence as a statement would be prejudicial to the interests of creditors injured by a fraudulent nondisclosure or omission by immunizing it against any determination of nondischargeability under § 523(a)(2).

50.     If silence or an omission from a loan application or financial statement [as opposed to a written misrepresentation] is construed as a statement, it certainly qualifies as a statement concerning the debtor's financial condition.   *Appling,* 138 S.Ct. at 1761. [holding that a statement respecting the debtor's financial condition means one that "has a direct relation to or impact on the debtor's overall financial status."].

51.     However, such an omission would totally evade any determination of nondischargeability under the provisions of § 523(a)(2).  It would be excluded by the express statutory language of § 523(a)(2)(A).  Further, it could not be rendered nondischargeable under § 523(a)(2)(B) because, by definition, an omitted item has not been reduced to writing.

52.    Silence regarding the existence of a material fact does not constitute a statement which can properly fall under the auspices of 11 U.S.C. § 523(a)(2)(B).

53.    Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it by the Defendant is nondischargeable as a debt obtained by a false statement in writing respecting the financial condition of the debtor or of an insider of the debtor pursuant to § 523(a)(2)(B) of the Bankruptcy Code must be denied.

*Nondischargeability under § 523(a)(4)*:  *Debt Arising From Fraud or Defalcation*
                                          *in a Fiduciary Capacity.*

54.    11 U.S.C. §523(a)(4) states that:

(a) A discharge under Section 727 . . . of this title does not discharge an
        individual debtor from any debt . . .

(4) for fraud or defalcation while acting in a fiduciary
        capacity, embezzlement, or larceny.

55.    The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

56.    Whether the actions of an individual were taken in a fiduciary capacity for the purposes of § 523(a)(4) is determined by federal law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

57.    However, "state law is important in determining whether or not a trust obligation exists."  *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

58.    The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

-26-

> [T]he concept of fiduciary under §523(a)(4) is narrower than
> it is under general common law.  Under §523(a)(4),
> "fiduciary" is limited to instances involving express or
> technical trusts.  The purported trustee's duties must,
> therefore, arise independent of any contractual obligation.
> The trustee's obligations, moreover, must have been imposed
> prior to, rather than by virtue of, any claimed
> misappropriation or wrong.  Constructive trusts or trusts *ex
> malificio* thus also fall short of the requirements of
> §523(a)(4).
>
> . . . Statutory trusts, by contrast, can satisfy the dictates of
> §523(a)(4).  It is not enough, however, that a statute purports
> to create a trust:  A state cannot magically transform ordinary
> agents, contractors, or sellers into fiduciaries by the simple
> incantation of the terms "trust" or "fiduciary."  Rather, to
> meet the requirements of §523(a)(4), a statutory trust must (1)
> include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

59.     However, the trust relationship must exist prior to the creation of, and without
        reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610
        F.2d 1335, 1338 (5th Cir. 1980).

60.     At the time of the creation of the indebtedness at issue, the Defendant did not stand
        in a fiduciary relationship as to the Plaintiff that is sufficient to meet the fiduciary
        capacity requirement under 11 U.S.C. § 523(a)(4).

61.     A defalcation under § 523(a)(4) in this circuit formerly required the establishment
        of a "willful neglect of duty" that was "essentially a recklessness standard."
        *Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 185 (5th Cir. 1997).

62.     Willfulness in that context had been "measured objectively by reference to what a
        reasonable person in the debtor's position knew or reasonably should have
        known."  *Harwood*, 637 F.3d at 624 (citing *Office of Thrift Supervision v. Felt (In
        re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001).

63.     However, the United States Supreme Court in a 2013 decision rejected an
        objective recklessness standard in favor of a heightened culpability standard for
        defalcation in this context.

64.     In the unanimous decision reached in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), the Supreme Court declared that "defalcation" for the purposes of § 523(a)(4) "includes a culpable state of mind requirement" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id*. at 1757.

65.     According to *Bullock*, "where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong." *Id*. at 1759.  Such an intentional wrong encompasses not only conduct which the fiduciary knows is improper, but it also encompasses reckless conduct, such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty.  *Id*.

66.     In seeking to require a higher degree of fault for a finding of a defalcation, similar to its "statutory neighbors" of fraud, embezzlement and larceny listed in § 523(a)(4), without imposing an actual requirement of specific intent to establish a defalcation, the Supreme Court adopted a standard of recklessness "of the kind set forth in the Model Penal Code §2.02(2)(c)."[44]

67.     Acknowledging that its adoption of this heightened level of culpability for defalcation cases under § 523(a)(4) had been recognized earlier in bankruptcy jurisprudence from the First and Second Circuit,[45] the Court further noted with approval that this "severe recklessness" standard tracks the showing required to demonstrate scienter in federal securities cases.[46]

---

[44] Model Penal Code §2.02(2)(c) states that:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(2)(c) (Thomson Reuters, Westlaw through 2012).

[45] *See, e.g.*, *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2nd Cir. 2007).

[46] Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).

68.    Utilizing the MPC definition of recklessness and analyzing the defalcation
standard to scienter determinations in federal securities cases is an effort to
exclude that type of recklessness arising as a consequence of mere negligence or
inadvertence.

69.    As recognized in securities law cases in the Fifth Circuit, this type of "severe
recklessness is limited to those highly unreasonable omissions or misrepresen-
tations that involved not merely simple or even inexcusable negligence, but an
extreme departure from the standard of ordinary care, and that present a danger of
misleading buyers or sellers [of securities] which is either known to the defendant
or is so obvious that the defendant must have been aware of it." *Abrams v. Baker
Hughes, Inc*., 292 F.3d 424, 430 (5th Cir. 2002)

70.    Thus, such a heightened culpability requirement will ensure that the "harsh
sanction of non-dischargeability is reserved for those who exhibits some portion of
misconduct." *Hyman*, 502 F.3d at 68-69.

71.    At the time of the creation of the indebtedness at issue, the Defendant did not
engage in an intentional wrong nor act with severe recklessness in his actions
toward the Plaintiff that is sufficient to meet the defalcation requirement under 11
U.S.C. § 523(a)(4).

72.    Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it
by the Defendant is nondischargeable as a debt arising from fraud or defalcation
while acting in a fiduciary capacity pursuant to § 523(a)(4) of the Bankruptcy
Code must be denied.


*Nondischargeability under § 523(a)(4): Debt Arising From Embezzlement.*

73.    "Embezzlement is defined for the purposes of § 523(a)(4) as the fraudulent
appropriation of property by a person to whom such property has been entrusted,
or into whose hands it has lawfully come." *Miller v. J.D. Abrams Inc. (Matter of
Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999).

74.    "Embezzlement, however, is not limited to situations in which one person is
entrusted with the property of another.  It also applies where . . . a person lawfully
obtains property, but then fraudulently appropriates it for his or her own use."
*Powers v. Caremark, Inc. (In re Powers)*, 261 F. App'x. 719, 723 (5th Cir. 2008).

-29-

75. "Given that a debtor has lawful control of the property, embezzlement then requires three elements: (1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009) *(citing Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006)).

76. Fraudulent intent is "an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property." *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008); *Soisson v. Hillebrandt (In re Hillebrandt)*, 2011 WL 2447738 at *20 (Bankr. S.D. Miss., June 15, 2011).

77. "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 582 (Bankr. N.D. Tex. 2010).

78. Because he did not possess nor was he entrusted with property belonging to the Plaintiff, the Defendant did not commit an embezzlement of funds.

79. Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it by the Defendant is nondischargeable as a debt arising from embezzlement pursuant to § 523(a)(4) of the Bankruptcy Code must be denied.

*Nondischargeability under § 523(a)(4)*: *Debt Arising From Larceny.*

80. Larceny is the wrongful taking and carrying away of the property of another with intent to convert such property to the taker's own use *without* the consent of the owner. *See generally, NF Clean v. Kakal* (*In re Kakal*), 596 B.R. 335, 342 (Bankr. S.D. Tex. 2019); *S&S Food Corp. v. Sherali (In re Sherali)*, 490 B.R. 104, 124 (Bankr. N.D. Tex. 2013).

81. Larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing. Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care. *Wright v. Minardi* (*In re Minardi*), 536 B.R. 171, 190 (Bankr. E.D. Tex. 2015); *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

82.     Because he did not engage in a conversion of property belonging to the Plaintiff, the Defendant did not commit larceny.

83.     Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it by the Defendant is nondischargeable as a debt arising from larceny pursuant to § 523(a)(4) of the Bankruptcy Code must be denied.

*Nondischargeability Under § 523(a)(6):  Debt Arising from Willful and Malicious Injury*

84.     The Plaintiff further contends that the debt owed to it should be excepted from discharge as a debt arising from a willful and malicious injury inflicted upon it by the Debtor-Defendant.

85.     Section 523(a)(6) of the Bankruptcy Code provides that:

   (a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

        (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

86.     In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court significantly narrowed the scope of debts that could be deemed nondischargeable under § 523(a)(6).

87.     The *Geiger* decision clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury.

88.     As subsequently interpreted by the Fifth Circuit, a recovery under § 523(a)(6) for a "willful and malicious injury" now requires proof that such injury arose from a deliberate and intentional act by a debtor that was inflicted under circumstances evidencing either: (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm.  *Miller v. J. D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied, Miller v. J.D. Abrams, Inc.*, 526 U.S. 1016 (1999);  *see also Caton v. Trudeau (In re Caton),* 157 F.3d 1026, 1029 (5th Cir. 1998).

89.     The "objective substantial certainty" prong "is a recognition of the evidentiary reality that defendants rarely admit malicious intent.  A court is thus expected to

**-31-**

analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to cause harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009), *citing In re Vollbracht*, 276 F. App'x. 360 (5th Cir. 2007).

90.    The Defendant did not inflict a deliberate or intentional injury upon the Plaintiff.

91.    The Defendant took no action that created an objective substantial certainty of harm to the Plaintiff.

92.    Therefore, the Plaintiff's prayer for a declaration that the indebtedness owed to it by the Defendant is nondischargeable as a debt arising from the infliction of a "willful and malicious injury" as contemplated by § 523(a)(6) of the Bankruptcy Code must be denied.

## CONCLUSION

93.    Because the Court concludes that the Plaintiff, Swift Financial, LLC, has failed to prove by a preponderance of the evidence that the asserted debt owed by Defendant, Samuel Y. Opoku, to the Plaintiff, Swift Financial, LLC, was procured by false representations, false pretenses or actual fraud, judgment must be rendered for the Defendant under § 523(a)(2)(A).

94.    Because the Court concludes that the Plaintiff, Swift Financial, LLC, has failed to prove by a preponderance of the evidence that the asserted debt owed by Defendant, Samuel Y. Opoku, to the Plaintiff, Swift Financial, LLC, was obtained by a false statement in writing respecting the financial condition of the debtor or of an insider of the debtor,  judgment must be rendered for the Defendant under § 523(a)(2)(B).

95.    Because the Court concludes that the Plaintiff, Swift Financial, LLC, has failed to prove by a preponderance of the evidence that the asserted debt owed by Defendant, Samuel Y. Opoku, to the Plaintiff, Swift Financial, LLC, arose from a fraud or a defalcation committed in a fiduciary capacity, from an act of embezzlement, or from an act of larceny, judgment must be rendered for the Defendant under § 523(a)(4).

96.    Because the Court concludes that the Plaintiff, Swift Financial, LLC, has failed to

prove by a preponderance of the evidence that the asserted debt owed by Defendant, Samuel Y. Opoku, to the Plaintiff, Swift Financial, LLC, arose from the infliction of a willful and malicious injury, judgment must be rendered for the Defendant under § 523(a)(6).

97.   Thus, all relief requested in the Plaintiff's Complaint in the above-referenced adversary proceeding shall be denied.

98.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

99.   An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 12/02/2020

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

-33-